**NOT FOR PUBLICATION**                                              **CLOSED**

### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

_____
                               :

EVANGELITA INOA,                 :

                               :

           Plaintiff,      :         Civil Action No. 04-5326 (JAP)

                               :

          v.               :         **OPINION**

                               :

COMMISSIONER OF SOCIAL    :

SECURITY,                 :

                               :

          Defendant.      :
_____:

Appearances:

AGNES S. WLADYKA
Abromson & Carey, Esquires
60 Park Place Suite 601
Newark, New Jersey  07102
        Attorney for Plaintiff

CHRISTOPHER J. CHRISTIE
United States Attorney
JENNIFER S. ROSA
Special Assistant U.S. Attorney
c/o Social Security Administration
Office of General Counsel
26 Federal Plaza, Room 3904
New York, NY 10278-0004
        Attorney for Defendant

PISANO, District Judge:

Before the Court is Evangelita Inoa's ("Plaintiff") appeal from the final decision of the Commissioner of the Social Security Administration ("Commissioner") denying her request for Disability Insurance Benefits ("DIB") pursuant to Title II of the Social Security Act, 42 U.S.C. §§ 416(i) and 423 (2006).[1]  The Court has jurisdiction to review this matter under 42 U.S.C. § 405(g) and decides this matter without oral argument.  *See* Fed. R. Civ. P. 78.  For the reasons set forth below, the Court remands this case for further proceedings consistent with this opinion.

**I. Background**

Plaintiff was born on October 12, 1955 in Puerto Rico.  She has a ninth grade education. Plaintiff has held various jobs, but most recently she worked as a shipping and receiving clerk in a warehouse.  She asserts that she has been disabled since October 30, 2001.

**A. Procedural History**

On May 20, 2002, Plaintiff filed an application for DIB, alleging an inability to work as of October 30, 2001, due to a cardiac condition and pain in her ankle.  The Social Security Administration (the "SSA") denied Plaintiff's claim initially and upon reconsideration, as did the Administrative Law Judge Ralph J. Muehlig ("ALJ") in a hearing decision issued on March 16,

---

[1]The decision of the Administrative Law Judge Ralph J. Muehlig ("ALJ") discusses Plaintiff's request for DIB.  Although Plaintiff discusses in her memorandum of law that she requested both DIB and supplemental security income payments ("SSI"), it is not clear from the record whether she in fact requested SSI.  Nonetheless, the standard for determining when a claimant is seeking DIB under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq.*, is identical to the standard for determining when a claimant is seeking SSI under Title XVI of the Social Security Act, 42 U.S.C. § 1381 *et seq*.  *See* 42 U.S.C. §§ 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."); 42 U.S.C. § 1383(c)(3) ("The Final determination of the Commissioner of Social Security . . . shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.").

2004.  Plaintiff requested a review of  the ALJ's decision by the Social Security Appeals Council

(the "Appeals Council") on March 19, 2004, and requested a copy of all exhibits submitted to the

ALJ.  On July 13, 2004, the Appeals Council sent the exhibits requested by the Plaintiff and

informed Plaintiff that she could submit new and material evidence with respect to the issues

considered in the ALJ's decision.  On September 28, 2004, the Appeals Council acknowledged

the receipt of additional evidence submitted by Plaintiff, but denied Plaintiff's request for a

review.  On November 9, 2004 the Appeals Council: (1) acknowledged the receipt of further

evidence from Plaintiff; (2) set aside their earlier action to consider additional information; and

(3) again denied Plaintiff's request for a review.  Thus, the ALJ's ruling became the

Commissioner's final decision.  Plaintiff filed this action challenging the final decision on

November 29, 2004.

> **B. Factual History**

> **1. Plaintiff's Employment Prior to October 30, 2001**

Immediately prior to her alleged disability onset date of October 30, 2001, Plaintiff had

been employed as a shipping and receiving clerk in a warehouse, a position she had held since

March 2001.  In this position her responsibilities included receiving merchandise, organizing it in

the warehouse, and compiling inventory reports.  Plaintiff testified that she performed these tasks

both sitting and standing.  Plaintiff's other work history includes:  temporary employment as a

quality control clerk for approximately one year prior to her most recent employment; a position

as a laundry attendant from 1988 through 1999; and work packaging sunglasses from 1987

through 1988.

## 2. Plaintiff's Daily Activities

Plaintiff lives with her fifty-one year old husband.  She prepares breakfast, lunch, and dinner every day.  Plaintiff shops every Saturday with her husband who pushes the cart and picks up the items.  Both Plaintiff and her husband share in the household maintenance.  For example, Plaintiff washes the dishes and does the laundry while her husband pays the bills, takes out the garbage, performs household repairs and tends the garden.  Plaintiff testified that she walks three to four blocks every day for exercise and that activity does not cause fatigue unless she walks up hill, and it does not cause her to experience chest pains or shortness of breath.  Accompanied by her husband, Plaintiff visits friends and relatives and attends religious activities.  According to Plaintiff, there has been no change in her "social/recreational activities" as a result of her condition.  Tr. at 119.

## 3. Plaintiff's History

### a. Medical History Background

The record indicates that Plaintiff has a history of treatment for a pre-existing cardiac condition.  Several years ago when she was pregnant, Plaintiff's doctors discovered heart palpitations that were attributable to a childhood bout with rheumatic fever.  As a result, Plaintiff had a prosthetic mitral valve inserted in her heart on September 9, 1991.  Approximately eleven years later, on August 29, 2002, Plaintiff had a second surgery to install a prosthetic aortic valve and to replace the prosthetic mitral valve.      Apparently, these surgeries did not completely alleviate her heart palpitations.  Plaintiff testified that she experiences palpitations for approximately fifteen to twenty minutes a day, every day.  She testified that she is frightened by these occurrences, which she said feel like her heart is in her throat.  According to Plaintiff, these

4

sudden palpitations occur when she is lying down, sitting down, walking or performing a task in her house.  She stated that she rests after an episode.

Plaintiff has seen a cardiologist every six weeks for the past twenty years.  She testified that her cardiologist recommended that she reduce the daily intake of salt in her diet.  In her testimony, Plaintiff stated that despite her heart palpitations her doctor told her "everything's okay."

In addition to heart palpitations, Plaintiff asserted that she is unable to sleep at night because she is frightened from the clock-like ticking sound of her prosthetic valves.  As a result of her sleepless nights, Plaintiff testified that she is fatigued during the day.  Indeed, when specifically asked by the ALJ what prevents her from working, Plaintiff answered that she is always tired and she does not get enough sleep because of this ticking.

Plaintiff has also complained of pain in her right ankle, and she testified that she felt as though there were needles in the bottom of her feet.  According to Plaintiff, she stopped working in October 2001 as a result of lack of energy due to her cardiac condition as well ankle pain.

**b. Medical Evidence Considered by the ALJ**

**1. Medical Records from Kennedy Rehabilitation**

From October 2001 through March 2002, Plaintiff was treated by Dr. Sarah Shah-Gibiliso for low back pain, sciatica, neuropathy, and radiculopathy.  Dr. Shah-Gibilisco's findings included: numbness of the fifth toe of the right foot; tenderness of the hamstring; difficulty sitting, standing and walking; and a limping gait.

**2. Medical Records from Christ Hospital**

Plaintiff was admitted to Christ Hospital on April 9, 2002 after experiencing shortness of

breath.  She remained an inpatient until April 20, 2002, where doctors found Plaintiff suffered from congestive heart failure, aortic insufficiency, and mitral valve insufficiency.  A transthoracic echocardiogram revealed that Plaintiff had aortic insufficiency of 3+.  A TEE and right and left cardiac catheterization disclosed Plaintiff's prosthetic mitral valve and revealed moderate aortic insufficiency.  A subsequent right and left cardiac catheterization disclosed pulmonary hypertension.

On August 29, 2002, Plaintiff underwent surgery to replace her aortic valve and mitral valve.  On September 27, 2002, Plaintiff had a normal echocardiogram with a 55% left ventricle fraction.

### 3. Dr. Mitchell Steinway

Dr. Steinway, Plaintiff's orthopedist, treated her from January 2002 through July 2002 for pain in her right ankle and foot.  After a series of MRIs and x-rays, the doctor diagnosed Plaintiff with avascular necrosis and osteoporosis of the right ankle and foot.  By July 2002, Dr. Steinway found that the avascular necrosis and osteoporosis had been completely resolved.

### 4. Dr. Hector Rubenstein

Dr. Rubenstein, a cardiologist, filed an internal medical report for the State of New Jersey Department of Labor Division of Disability Determination Services on January 2, 2003.  In the report Dr. Rubenstien stated that he first examined Plaintiff in January 1982 and more recently in December 2002.  In 2002, he diagnosed Plaintiff with aortic and mitral valve replacement and noted that she suffered from dyspnea, heart palpitations, and fatigue.  Dr. Rubenstein concluded that Plaintiff's prognosis was stable.  He also notes in an April 2002 report that Plaintiff had suffered from avascular necrosis in the right talus, which had completely resolved, leaving

6

Plaintiff "symptom free."  Tr. at 137.

**5. Dr. Kopel Burk**

Dr. Burk, the state agency doctor, evaluated Plaintiff's physical residual functional capacity assessment on February 3, 2003.  The doctor found that Plaintiff could occasionally lift and/or carry ten pounds and frequently lift and/or carry less than three to five pounds.  Additional findings included Plaintiff's ability to stand and/or walk at least four hours in an eight-hour workday, sit for a total of about six hours in an eight-hour workday, and that Plaintiff had an unlimited ability to push and/or pull.

**6. Medical Records from Bergenline X-Ray Diagnostic Center**

The records show that on March 12, 2003, an x-ray examination of Plaintiff's left elbow indicated a normal left elbow.  A chest x-ray performed on September 30, 2002, revealed a normal sized heart with no active pulmonary disease.

**7. Testimony of Dr. Donald Peyser**

Dr. Peyser, a specialist in cardiology and internal medicine, testified as a medical expert at the hearing before the ALJ.  He explained Plaintiff's ejection fraction was 55% after her 2002 surgery which indicated normal cardiac functioning.  He testified that Plaintiff's complaint regarding the noise from the mechanical valves was common and stated that most people sleep with earplugs to alleviate the nuisance.  He further testified that Plaintiff would not meet or equal any listing and should be able to do "light work."  Although Dr. Peyser admitted that Plaintiff has occasional ventricular premature beats, he testified that she does not have a lethal arrhythmia. According to the doctor, most people that have these extra heart beats do not perceive them, but unfortunately, Plaintiff perceives them and as a result becomes anxious.   Plaintiff was treated for

these heart palpitations with a drug called Tropol, and Dr. Peyser stated that she can be treated with an anti-arrhythmic drug if the symptoms become worse.  Dr. Peyser testified that these heart palpitations were normal in patients who have had heart valve replacement surgery.

### c. Medical Records Submitted by Plaintiff to the Appeals Council

Subsequent to the decision by the ALJ, the following medical records were submitted to the Appeals Council by Plainitff:

### 1. Dr. Hector Rubenstein

On February 12, 2004, Dr. Rubenstein submitted medical records from March 15, 2003, through January 24, 2004, to Plaintiff's attorney.  The records included an echocardiogram report which indicated that Plaintiff's left ventricular size and function appeared normal.  In addition, Dr. Rubenstein noted that her aortic valve replacement and mitral valve replacement appeared to be working well and were without vegetation.  Dr. Rubenstein also included a report from Bergenline X-Ray Diagnostic Center where Plaintiff received an x-ray on her left elbow.  The x-rays revealed a normal left elbow.

### 2. Dr. Luis R. Locuratolo

In a letter dated April 16, 2004, Dr. Locuratolo, a psychiatrist, stated that Plaintiff was under his care and that she suffered from "physical and emotional disorders.  He further stated that she has been unable to work since October 2001.   His letter provided no additional information or details regarding these "disorders," and he did not support this statement with a specific diagnosis or any further medical or clinical evaluation.

In a second letter dated June 11, 2004, Dr. Locuratolo states that Plaintiff has been under his care since April 16, 2004, the date of his original letter, and essentially repeats the contents of

the April 16th letter.

### 3. Palisades Medical Center

Records dated August 6, 2004 indicated abnormal increased tracer uptake involving the distal tibia, talus as well as metatarsal bones, suspicious of osteomyelitis.  The right foot demonstrated a focus of increased uptake involving the subtalar area, probably with arthritic changes.

## II. Standards of Review

A reviewing court must uphold the Commissioner's  factual decisions if they are supported by "substantial evidence." 42 U.S.C. §§ 405(g); *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992).  "Substantial evidence" means more than "a mere scintilla." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 220 (1938)).  "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id.*  The inquiry is not whether the reviewing court would have made the same determination, but rather whether the Commissioner's conclusion was reasonable.  *Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988).  Thus, substantial evidence may be slightly less than a preponderance.  *Stunkard v. Sec'y of Health & Human Servs.*, 841 F.2d 57, 59 (3d Cir. 1988).

Some types of evidence will not be "substantial."  For example,

'[a] single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence.  Nor is evidence substantial if it is overwhelmed by other evidence - particularly certain types of evidence (e.g. that offered by treating physicians) - or if it really constitutes not evidence but mere conclusion.'

*Wallace v. Sec'y of Health & Human Servs.*, 722 F.2d 1150, 1153 (3d Cir. 1983) (quoting *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983)).

The reviewing court must review the evidence in its totality. *See Daring v. Heckler*, 727 F.2d 64, 70 (3d Cir. 1984). In order to do so, "a court must 'take into account whatever in the record fairly detracts from its weight.'" *Schonewolf v. Callahan*, 972 F. Supp. 277, 284 (D.N.J. 1997) (quoting *Willibanks v. Sec'y of Health & Human Servs.*, 847 F.2d 301, 303 (6th Cir. 1988) (internal citation omitted)). The Commissioner has a corresponding duty to facilitate the court's review: "[w]here the [Commissioner] is faced with conflicting evidence, he must adequately explain in the record his reasons for rejecting or discrediting competent evidence." *Ogden v. Bowen*, 677 F. Supp. 273, 278 (M.D. Pa. 1987) (citing *Brewster v. Heckler*, 786 F.2d 581 (3d Cir. 1986)). As the Third Circuit has held, access to the Commissioner's reasoning is indeed essential to a meaningful court review:

> Unless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.

*Gober v. Matthews*, 574 F.2d 772, 776 (3d Cir. 1978) (quoting *Arnold v. Sec'y of Health, Educ. & Welfare*, 567 F.2d 258, 259 (4th Cir. 1977)). Nevertheless, the district court is not "empowered to weigh the evidence or substitute its conclusions for those of the fact-finder." *Williams*, 970 F.2d at 1182.

## A. The Record Must Provide Objective Medical Evidence

Under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq.*, a claimant is required to provide objective medical evidence in order to prove her disability. 42 U.S.C. § 423(d)(5)(A) ("An individual shall not be considered to be under a disability unless she furnishes such medical and other evidence of the existence thereof as the Secretary may require."). Accordingly, a

Plaintiff cannot prove that she is disabled based solely on her subjective complaints of pain and other symptoms.  She must provide medical findings that show that she has a medically determinable impairment.  *See id.*; *see also* 42 U.S.C. § 423(d)(1)(A) (defining a disabled person as one who is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment...").

Furthermore, a claimant's symptoms, "such as pain, fatigue, shortness of breath, weakness, or nervousness, will not be found to affect . . . [one's] ability to do basic work activities unless "medical signs" or laboratory findings show that a medically determinable impairment(s) is present."  20 C.F.R. § 404.1529(b); *see Hartranft v. Apfel*, 181 F.3d 358, 362 (3d Cir. 1999) (rejecting claimant's argument that the ALJ failed to consider his subjective symptoms were inconsistent with objective medical evidence and claimant's hearing testimony); *Williams*, 970 F.2d at 1186 (denying claimant benefits where claimant failed to proffer medical findings or signs that he was unable to work); *Green v. Schweiker*, 749 F.2d 1066, 1069-70 (3d Cir. 1984) (emphasizing that "subjective complaints of pain, without more, do not in themselves *constitute* disability").

## B. The Five-Step Analysis for Determining Disability

Plaintiff's eligibility for DIB is governed by 42 U.S.C. § 423.  A claimant is eligible for DIB if she meets the disability period requirements of 42 U.S.C. § 416(i), and demonstrates that she is disabled based on an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A).  A person is disabled for these purposes if her physical or

mental impairments are "of such severity that she is not only unable to do her previous work, but cannot, considering her age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ."  42 U.S.C. § 423(d)(2)(A).

Social Security regulations set forth a five-step, sequential evaluation procedure to determine whether a claimant is disabled.  *See* 20 C.F.R. § 404.1520.  For the first two steps, the claimant must establish (1) that she has not engaged in "substantial gainful activity" since the onset of her alleged disability, and (2) that she suffers from a "severe impairment" or "combination of impairments."  20 C.F.R. § 404.1520(a)-(c). Given that a claimant bears the burden of establishing these first two requirements, the failure to meet this burden automatically results in a denial of benefits.  *See Bowen v. Yuckert*, 482 U.S. 137, 146-47 n.5 (1987).

If the claimant satisfies her initial burdens, the third step requires that she provide evidence that her impairment is equal to or exceeds one of those impairments listed in Appendix 1 of the regulations ("Listing of Impairments").  *See* 20 C.F.R. § 404.1520(d).  Upon such a showing, she is presumed to be disabled and is automatically entitled to disability benefits.  *Id.*  If she cannot so demonstrate, the benefit eligibility analysis proceeds to steps four and five.

The fourth step of the analysis focuses on whether the claimant's "residual functional capacity" sufficiently permits her to resume her previous employment.  *See* 20 C.F.R. § 404.1520(e).  "Residual functional capacity" is defined as "that which an individual is still able to do despite limitations caused by his or her impairments."  20 C.F.R. 404.1520(e).  If the claimant is found to be capable of returning to her previous line of work, then she is not "disabled" and not entitled to disability benefits.  *Id.*  Should the claimant be unable to return to her previous work, the analysis proceeds to step five.  At step five, the burden shifts to the Commissioner to

demonstrate that the claimant can perform other substantial gainful work.  *See* 20 C.F.R. § 404.1520(f).  If the Commissioner cannot satisfy this burden, the claimant shall receive social security benefits.  *Yuckert*, 482 U.S. at 146-47 n5.

### III. The ALJ's Decision

After reviewing the available evidence and considering Plaintiff's testimony, the ALJ concluded that Plaintiff was not disabled.  The ALJ made the following findings:

The ALJ determined that Plaintiff met step one of the analysis because she had not engaged in substantial gainful activity since October 30, 2001, the alleged disability onset date. The ALJ determined that Plaintiff met step two of the analysis because her impairments qualified as "severe" under the Social Security Regulations.  *See* 20 C.F.R. § 404.1520(b).  However, the ALJ concluded that Plaintiff did not meet the requirements of step three because her alleged impairments did not meet or medically equal any of the impairments in the Listing of Impairments.  The ALJ stated specifically, that there was no indication of chronic heart failure while on a regimen of prescribed treatment as required by listing 4.02 with documented cardiac enlargement as provided in subsections A, B, or C.

The ALJ also found that Plaintiff's subjective complaints of disabling pain and limitations that would preclude her from significant work activity were not credible or consistent with 20 C.F.R. § 404.1529 ("there must be medical signs and laboratory findings which show that you have a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged") and Social Security Ruling 96-7p (clarifying when the evaluation of symptoms, including pain, under 20 C.F.R. § 404.1529 requires a finding about the credibility of an individual's statements about pain or other symptoms).  The ALJ concluded that Plaintiff's

complaints of disabling symptoms could not be accepted because the subjective complaints were inconsistent with the objective medical evidence.  The ALJ also pointed to the fact that Plaintiff sought out only limited modalities of treatment for her alleged pain and limitation.

The ALJ recognized that Plaintiff did suffer from a degree of pain and limitation due to her impairments which did restrict her capacity to perform certain types of work.  After considering Dr. Peyser's testimony, the ALJ found that Plaintiff was unable to perform the degree of lifting and carrying objects associated with work in the medium and more strenuous categories.  The ALJ found however, that Plaintiff has had the capacity at all material times to perform the full range of light work.[2]  In addition, the ALJ determined that Plaintiff has not had any significant non-exertional limitations.

The ALJ proceeded to step four of the analysis, which focuses on whether the Plaintiff's residual functional capacity sufficiently permits her to resume her previous employment.  *See* 20 C.F.R. § 404.1520(e).  If the claimant is found to be capable of returning to her previous line of work, then she is not "disabled" and not entitled to disability benefits.  *Id.*  A comparison between the claimant's residual functional capacity and the requirements of her past relevant work is necessary to satisfy step four.  *See* 20 C.F.R. § 404.1520(e)-(f); *Burnett v. Commissioner of Social*

_____

[2] 20 C.F.R. § 404.1567(b) provides in relevant part:

Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.  If someone can do light work, we determine that he or she can also do sedentary work, unless there are some additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

*Sec. Admin.*, 220 F.3d 112, 120 (3d Cir. 2000).  Based on Plaintiff's testimony at the hearing, the ALJ stated that Plaintiff's past relevant work as a shipping and receiving clerk qualified as a light level of exertional work.  The ALJ determined that Plaintiff met step four of the analysis because her residual functional capacity indicated that she was capable of performing her past relevant work.  As the ALJ found that Plaintiff was capable to perform her past relevant work, he did not need to proceed to step five of the analysis.

Plaintiff now asserts that substantial evidence did not support the Commissioner's determination that Plaintiff has not established that her impairments are of such severity as to preclude her from engaging in substantial gainful activity, as required by step four of the analysis.

Specifically Plaintiff argues:

1. The Commissioner improperly evaluated the medical evidence;

2. The Commissioner erred as a matter of law in finding that Plaintiff can perform the full range of light work.

The Commissioner contends that the ALJ's decision is supported by substantial evidence and therefore should be affirmed.

## IV. Legal Discussion

The Court must evaluate whether the ALJ's decision that Plaintiff's residual functional capacity permits her to resume her previous employment is supported by substantial evidence.

In the instant case, the ALJ made the following determinations after reviewing the evidence:

Based on the entire record, including the testimony of claimant, I conclude that the evidence fails to support the claimant's assertions of disability.  Although the claimant has suffered from a medically determinable "severe" impairment, the evidence establishes that the claimant has the capacity to function adequately to

15

perform many basic activities associated with work.  However, it is evident that the claimant suffers some pain and limitation due to the impairment, and as a result, capacity to perform work is significantly restricted.  I give due consideration and weight to the opinions of medical expert Dr. Peyser.  Therefore, I find that the claimant has been unable to perform the degree of lifting and carrying associated with work in the medium and more strenuous categories, but has had at all material times, the residual functional capacity to perform work that involves lifting and carrying objects weighing up to 20 pounds; frequently lifting and carrying objects weighing up to 10 pounds; standing, walking, and sitting up to six hours in an eight-hour day; pushing and pulling arm and leg controls; and the full range of light work.

    . . . .

Step four of the sequential evaluation involves determining whether the claimant has had the residual functional capacity to perform past relevant work.  By the claimant's testimony at the hearing, past relevant work includes shipping and receiving clerk which is within the light exertional level of work.  In view of my finding regarding residual functional capacity, I conclude that the claimant has been capable of performing her past relevant work.

    . . . .

Accordingly, I conclude that the claimant has not been disabled within the meaning of the Social Security Act.

## A. The ALJ's Evaluation of the Medical Evidence

Plaintiff first argues that the ALJ failed to properly evaluate the medical evidence by failing to give credence to various subjective complaints of Plaintiff.  In his decision, the ALJ specifically addressed Plaintiff's "subjective complaints of disabling pain and other symptoms and limitations precluding all significant work activity" and found such complaints to be not credible. As discussed above, 20 C.F.R. § 404.1529 requires that the objective medical evidence demonstrate a basis for subjective complaints.  Complaints about pain or other symptoms alone will not establish that a claimant is disabled.  *See* 20 C.F.R. § 404.1529(a).  Rather, these complaints must be coupled with objective medical signs and laboratory findings that demonstrate

a medical impairment that could reasonably produce the alleged subjective complaints. *See id.*

At the hearing before the ALJ, Plaintiff testified that she stopped working in October 2001 because of her cardiac condition and a problem with pain in her ankle. In 2002, she underwent cardiac surgery, but even after the surgery Plaintiff complained of palpitations and tiredness. When asked specifically what conditions prevented her from working, Plaintiff testified that she felt too tired to work. She complained of difficulty in sleeping due to the sounds made by her prosthetic heart valves.

The ALJ concluded that Plaintiff's complaints of "disabling symptoms" were inconsistent with the medical evidence in the record and that Plaintiff's claimed functional limitations were inconsistent with the overall record evidence. The ALJ's conclusion in this regard is supported by the substantial evidence. As noted by the ALJ, after Plaintiff's heart surgery in 2002, her ejection fraction and her echocardiograms were normal, and the medical expert, Dr. Peyser, testified that Plaintiff's cardiac function after the surgery was excellent. Dr. Peyser further testified that Plaintiff's sleeping difficulty could be resolved with the use of earplugs. A remedible impairment cannot form the basis for disability. *Dumas v. Schweiker*, 712 F.2d 1545, 1553 (2d Cir. 1983)

The ALJ also points out that Plaintiff has sought out only limited modalities of treatment for her alleged pain and limitation. While it is true that Plaintiff underwent open heart surgery for her cardiac conditions, with respect to certain other alleged complaints it appears Plaintiff's treatment has been limited. For example, the records from Kennedy Rehabilitation indicates that Plaintiff complained of reduced reflexes with altered gait, but Plaintiff appears to have ceased treatment for these symptoms in March 2002. Additionally, Dr. Steinway's records show that by July of 2002 Plaintiff's foot condition had resolved and that Plaintiff no longer complained of

pain.

     As the ALJ noted, Plaintiff's complaints of disabling symptoms are inconsistent with other record evidence as well.  For example, Plaintiff testifies that she walks three to four blocks every day for exercise, and that this exercise does not cause fatigue, chest pain or shortness of breath. She is also able to prepare three meals a day, wash the dishes, do laundry, read the newspaper, go shopping with her husband, visit friends and relatives, attend religious services and perform household chores along with her husband.  Indeed, according to Plaintiff, her social activities have not been curtailed by her conditions.  Consequently, the ALJ's determination regarding the credibility of Plaintiff's subjective complaints of pain and limitation is supported by the substantial evidence.

     Plaintiff next argues that the ALJ did not consider the combined effect of all of Plaintiff's ailments.  Specifically, Plaintiff contends that the ALJ failed to consider her "orthopedic" and "mental" impairments in addition to her cardiac condition.  With respect to Plaintiff's alleged orthopedic impairments, Plaintiff states that she had been diagnosed with low back pain, sciatica, neuropathy, radiculopathy and osteomyelitis.  Contrary to Plaintiff's argument, the ALJ expressly considered these impairments.  *See* Tr. at 20.  The ALJ expressly considered medical evidence from Dr. Shah-Gibilisco that indicated that Plaintiff sought treatment for low back pain, sciatica, neuropathy, and radiculopathy from October 2001 through March 2002.  There is  no indication that Plaintiff continued treatment for back pain and related impairments after March 2002.   The ALJ also considered medical reports from Dr. Steinway, Plaintiff's treating physician from January 2002 through July 2002, which revealed that Plaintiff's ankle pain was resolved by July 2002..

With respect to an alleged mental impairment, in addition to the fact that such an impairment did not form the basis of plaintiff's application for disability benefits, there was simply no evidence in the record for the ALJ to consider.  To support her claim of a mental impairment, Plaintiff points only to two letter directed to the Appeals Council that are dated after the ALJ's decision.  The letters are from Dr. Locuratulo, a psychiatrist who began treating the plaintiff in April 2004, and contain no clinical findings or notes regarding treatment.  The two nearly identical letters, one being a mere five sentences the other being four, simply state that plaintiff has been unable to hold a job because she suffers from "physical and emotional disorders."  On their face, the letters do not appear sufficient to support Plaintiff's claim of a disabling mental disorder.  *See* 42 U.S.C. § 423 (defining a "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques").

Moreover, the district court is not obligated to consider new evidence submitted to the Appeals Council if there was no showing of good cause as to why it was not previously presented to the ALJ.  *See Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001).  In *Matthews*, the Third Circuit stated that the claimant failed to show good cause because she did not explain why she did not attempt to obtain this evidence in time for consideration by the ALJ.  *Id.* at 595.  Likewise, Plaintiff has similarly made no showing of good cause in this matter.

## B. The ALJ's Evaluation of Plaintiff's Ability to Perform the Full Range of Light Work

Plaintiff contends that the ALJ erred in determining that Plaintiff retains the residual functional capacity to perform the full range of light exertion level work, including her previous work.  While the ALJ recognized that Plaintiff "suffers from some pain and limitation due to the

impairment [and her] capacity to perform work is significantly restricted," Tr. at 22, the ALJ

found that

> the claimant's residual functional capacity has been, since October 30, 2001,
> limited to performing work that involves lifting and carrying objects weighing up
> to 20 pounds; frequently lifting and carrying objects weighing up to 10 pounds;
> standing, walking and sitting up to six hours in an eight-hour day; pushing and
> pulling arm and leg controls; and the full range of light work.  The claimant has not
> had any significant non-exertional limitations.

Tr. at 23.

In reaching this conclusion, the ALJ stated that he gave "due consideration and weight to

the opinions of the medical expert Dr. Peyser," a specialist in cardiology and internal medicine.

Tr. at 22.  Dr. Peyser testified at the hearing before the ALJ on March 10, 2004, that he reviewed

Plaintiff's medical records "that go up to '02."  Tr. at 36.  It was Dr. Pesyer's opinion that, after

her heart surgery, Plaintiff's "cardiac function ... was excellent" and she "has no cardiac

symptoms really at this time."  Tr.  37.  Dr. Peyser opined that Plaintiff did not meet or equal any

listing and that she "should be able to do light work."  Tr. at 37.

Plaintiff argues that the ALJ's conclusion regarding Plaintiff's residual functional capacity

is not supported by the substantial evidence and, in particular, that the record is unclear whether

Dr. Peyser was using the term "light work"as it is defined in the governing Social Security

regulations.  The Court agrees with Plaintiff that there is nothing in the record that clarifies

exactly what Dr. Peyser meant by "light work," nor is there anything in the record that would

support even a reasonable inference as to whether Dr. Peyser was referring the regulations.  As a

result, and because the ALJ's analysis regarding Plaintiff's residual functional capacity is largely

conclusory, the Court is unable to determine if the ALJ's conclusion is supported by the

substantial evidence.  A remand for further findings and analysis is appropriate.

20

Plaintiff also argues that the ALJ disregarded the Physical Residual Functional Capacity Assessment prepared on February 3, 2003, by the state agency medical consultant, Dr. Kopel Burk.  In contrast to the findings of the ALJ, Dr. Burk found that Plaintiff was able to occasionally lift and/or carry only ten pounds and frequently lift and/or carry only  three to five pounds.  Dr. Burke also found that Plaintiff could stand and/or walk four hours in a eight-hour workday; sit about six hours in an eight-hour workday; that Plaintiff had an unlimited ability to push and/or pull; and could occasionally climb a ramp/stairs.  The ALJ's decision does not mention Dr. Burke's report at all.

In articulating his decision, the ALJ is required to "not only [give] an expression of the evidence s/he considered which supports the result, but also some indication of the evidence which was rejected."  *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir.1981).  If the "ALJ fails to identify the evidence he or she rejects and the reason for its rejection," the Court is unable to conduct a substantial evidence review. *Walton v. Halter*, 243 F.3d 703, 710 (3d Cir.2001).

While it may be true, as the government points out, that Dr. Burk's report may be considered a weaker or less reliable form of evidence because Dr. Burk did not examine Plaintiff, the ALJ was nonetheless expected to consider it.  *See* 20 C.F.R. §§ 404.1513(c), 416.913(c) (stating "[a]t the administrative law judge and Appeals Council levels, we will consider residual functional capacity assessments made by State agency medical and psychological consultants and other program physicians and psychologists..."); *see also* 20 C.F.R. § 404.1527 (Regardless of its source, we will evaluate every medical opinion we receive . . . administrative law judges must consider findings of State agency medical and psychological consultants or other program physicians or psychologists as opinion evidence").  Upon consideration of such an assessment, the

21

ALJ may accord greater or lesser weight to it as appropriate.  However, "[s]ince it is apparent that the ALJ cannot reject evidence for no reason or for the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." *Cotter*, 642 F.2d at 707.

It is unclear whether the ALJ considered Dr. Burk's opinion, and, if the ALJ did consider the opinion, no explanation was provided as to why the opinion was disregarded.  Accordingly, the case shall be remanded for further analysis.

**IV. Conclusion**

For the reasons expressed above, the Court reverses and remands this case to the Commissioner for further proceedings consistent with this opinion.  Accordingly, this case is CLOSED.

/s/ Joel A. Pisano
JOEL A. PISANO U.S.D.J.

Date: August 28, 2006

Orig:   Clerk
cc:     All parties
        File